IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:08-CV-255-FL

| | |
|---|---|
| MICHAEL JOSEPH PETER and THEE DOLLHOUSE PRODUCTIONS N.C., INC., | ) ) ) ) |
| Claimants, | ) ) |
| v. | ) ) ) |
| REGALE, INC., and BARRY SANDMAN, | ) ) |
| Respondents. | ) |

ORDER

This matter, which arises from Regale, Inc.'s ("Regale") asset sale in alleged breach of a contract with Thee Dollhouse Productions N.C., Inc. ("Dollhouse N.C."), and which is related to another case currently before this court, comes now before the court on claimants' motion to compel arbitration (DE #6) and respondents' amended motion to stay arbitration (DE #13). The issues raised are ripe for ruling. For the reasons that follow, the court grants in part and denies in part claimants' motion to compel arbitration and grants in part and denies in part respondents' motion to stay arbitration.

## BACKGROUND

On June 15, 1992, Dollhouse N.C., a Florida corporation, entered into a contract with Regale, a North Carolina corporation, to provide managerial and consulting services to Regale in connection with Regale's operation of an adult nightclub in Raleigh, North Carolina ("the 1992 Agreement"). Dollhouse N.C.'s sole shareholder is Michael Peter ("Peter"), a Florida resident who bills himself

as a founder of the upscale adult nightclub industry and is the mark owner of the trademark "Thee Dollhouse." Barry Sandman ("Sandman"), a North Carolina resident, is president and ninety-five percent (95%) shareholder of Regale. By its terms, the 1992 Agreement was executed between Regale and Dollhouse N.C.[1]

The 1992 Agreement required Dollhouse N.C. to provide Regale with, among other things, the resources and personnel to attract and hire staff, training and personnel manuals, services of legal counsel with respect to any First Amendment issues, contract forms, and marketing formats. Regale was to pay Dollhouse N.C. a weekly fee of three percent (3%) of gross receipts for these services, and an additional three percent (3%) of gross receipts for use of the "Thee Dollhouse" name, logo, and trademark. This six percent (6%) payment was collectively referred to as the "base fee." In addition to the base fee, the contract provided that beginning with fiscal year 1993, Regale would pay Dollhouse N.C. a sum equal to twenty percent (20%) of its operating profits, which would increase to twenty-four-and-one-half percent (24.5%) in fiscal year 1995. These payments were referred to as "incentive payments." The 1992 Agreement contains an arbitration provision, which provides that "[a]ny dispute or controversy between the parties arising from or relating to this Agreement, the Production, the use of the Premises or the relationship between the parties shall be resolved by final and binding arbitration before the American Arbitration Association to be held in the State of North Carolina." 1992 Agreement, Article XIX.A.

The parties agree that Dollhouse N.C. performed as required under the 1992 Agreement for at least twelve months following its execution. Regale and Sandman (collectively "respondents")

---

[1] Sandman signed the 1992 Agreement on behalf of Regale, while Peter signed it on behalf of Dollhouse N.C. Peter also signed separately as mark owner of the "Thee Dollhouse" name, trademark, logo, and format.

2

contend, however, that Dollhouse N.C. stopped performing its duties under the contract in 1994, and that the parties terminated the 1992 Agreement during a meeting in Raleigh in 1996. At that time, respondents contend, Regale and Peter entered into a new oral licensing agreement by which Regale would pay only for use of the name "Thee Dollhouse" for so long as Regale used it. According to respondents, Regale made its final payment to Dollhouse N.C. under the 1992 Agreement on March 4, 1996, and beginning June 21, 1996, Regale made all payments directly to Peter pursuant to the terms of the new oral licensing agreement. Peter and Dollhouse N.C. (collectively "claimants") vigorously dispute this version of events and contend that the 1992 Agreement was never terminated.

On April 16, 2007, Regale conveyed substantially all of its Raleigh assets to Raleigh Restaurant Concepts, Inc. ("RRC"), the North Carolina subsidiary of VCG Holding Corporation ("VCG"), a national consolidator and operator of adult nightclubs. After closing on the purchase agreement with RRC, Regale sent a letter to claimants purporting to terminate any agreements between them.

Another case stemming from these transactions is currently pending before this court. The related case, Thee Dollhouse Prods. N.C., Inc. and Michael Joseph Peter v. David Fairchild, Hospitality Licensing Corp. d/b/a The Men's Club and VCG Holding Corp., No. 5:08-CV-282-FL, involves claims of tortious interference and misappropriation of trade secrets.[2] For convenience of

---

[2] The related case was initiated when claimants filed suit against VCG, David Fairchild ("Fairchild"), and Hospitality Licensing Corporation d/b/a The Men's Club ("Men's Club") on July 18, 2007, in Texas state court. The complaint alleged that VCG, Fairchild, and Men's Club tortiously interfered with the 1992 Agreement between Dollhouse N.C. and Regale, that VCG misappropriated trade secrets and confidential proprietary information, and that VCG, Fairchild, and Men's Club engaged in a civil conspiracy. Respondents were not named as defendants in the tort case, although they have recently moved to intervene. The tort case was removed to the United States District Court for the Northern District of Texas, where the claims against Fairchild and Men's Club were ultimately dismissed with prejudice by stipulation of the parties. After nearly a year of litigation, during which the parties conducted extensive discovery and filed dispositive motions, the tort case was transferred to the Eastern District of North Carolina. So extensive were the parties' filings in the Northern District of Texas that shortly before transferring the case to this district, the Texas district court judge entered order prohibiting the parties from filing any further motions without leave of court.

3

reference, the court refers to the above-captioned matter, in which the parties contest the arbitrability of their dispute, as the "arbitration case." The court refers to the related case as the "tort case." Peter and Dollhouse N.C. are complaining parties in both actions, which arise largely from the same factual transactions and involve common questions of law relating to the 1992 Agreement between Regale and Dollhouse N.C. and the 2007 asset sale between Regale and VCG's North Carolina subsidiary. An issue in both actions is the allegation by claimants here, and plaintiffs in the tort case, that Regale breached the 1992 Agreement when it allowed VCG to acquire certain of its Raleigh assets.

Claimants here filed a demand for arbitration against respondents with the American Arbitration Association on May 2, 2008, seeking (1) specific performance of the 1992 Agreement or damages from Regale for its breach; (2) damages from Regale for misappropriation of trade secrets and confidential proprietary information; and (3) damages directly from Sandman for his role in facilitating the alleged breach of the 1992 Agreement. Respondents filed a motion to stay the arbitration in Wake County Superior Court pursuant to N.C. Gen. Stat. § 1-569.7, and claimants removed the matter to this court on the basis of diversity of citizenship (DE #1).[3] After removal, claimants filed a motion to compel arbitration (DE #6), and respondents filed an amended motion to stay arbitration (DE #13). It is these motions in the arbitration case, as earlier noted, which come now before the court for decision.

---

Five motions in the tort case are currently pending before this court: VCG's motion to dismiss for failure to join necessary parties; VCG's motion for summary judgment; claimants' motion to stay the case pending arbitration; claimants' motion for leave to file a surreply to the motion for summary judgment; and respondents' motion to intervene.

[3] The substantive paragraphs of respondents' original motion to stay arbitration (DE #1), filed in state court, were incorporated into respondents' amended motion to stay. To the extent the docket reflects the original state court motion to stay arbitration as a motion that remains pending, the clerk is directed to terminate that motion.

## DISCUSSION

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, governs the rights and responsibilities of the parties with respect to an arbitration agreement.[4] Patten Grading & Paving, Inc. v. Skanska USA Bldg., Inc., 380 F.3d 200, 204 (4th Cir. 2004). The FAA provides, in pertinent part, that:

> [a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. As a result of this federal policy favoring arbitration, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). Thus, a court "has no choice but to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview." Adkins v. Labor Ready, Inc., 303 F.3d 496, 500 (4th Cir. 2002).

To further facilitate arbitration, Section 3 of the FAA authorizes a party to an arbitration agreement to demand a stay of court proceedings in order to pursue arbitration, provided, however, that "the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. "Although this principle of 'default' is akin to waiver, the circumstances giving rise to a statutory default are limited and, in light of the federal policy favoring arbitration, are not to be lightly

---

[4] The parties do not dispute the applicability of the FAA in this case.

5

inferred." Maxum Founds., Inc. v. Salus Corp., 779 F.2d 974, 981 (4th Cir. 1985); see also Forrester v. Penn Lyon Homes, Inc., 553 F.3d 340, 342 (4th Cir. 2009). While participation in litigation will not, by itself, constitute default, a party may default its right to arbitration if it "so substantially utiliz[es] the litigation machinery that to subsequently permit arbitration would prejudice the party opposing the stay." Maxum Founds., 779 F.2d at 981; see also Forrester, 553 F.3d at 343; Microstrategy, Inc. v. Lauricia, 268 F.3d 244, 250-52 (4th Cir. 2001). The party opposing arbitration bears the "heavy burden" of showing default. Am. Recovery Corp. v. Computerized Thermal Imaging, Inc., 96 F.3d 88, 95 (4th Cir. 1996).

In the Fourth Circuit, a litigant can compel arbitration under the FAA by demonstrating "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute." Whiteside v. Teltech Corp., 940 F.2d 99, 102 (4th Cir.1991). Respondents contest the second element, and so the court first considers whether a valid agreement to arbitrate exists between the parties, and, if so, whether the arbitration agreement applies to the dispute at hand. As an initial matter, the parties agree that the 1992 Agreement contains an arbitration provision, and respondents make no challenge specifically to the arbitration clause itself. Respondents argue, rather, that the parties terminated the 1992 Agreement during a 1996 meeting between the relevant parties in Raleigh, and that because the contract was terminated,

6

no valid agreement to arbitrate now exists. Claimants deny that any such meeting took place and maintain that the 1992 Agreement was never terminated.[5]

The arbitration clause in the 1992 Agreement is a broad one, requiring binding arbitration of "[a]ny dispute or controversy between the parties arising from or relating to this Agreement, the Production, the use of the Premises or the relationship between the parties." 1992 Agreement, Article XIX.[6] Because the arbitration clause does not exclude disputes regarding the contract's termination, whether the 1992 Agreement was terminated is an issue for the arbitrator, and not this court, to determine. See Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445-46 (2006) (holding that "an arbitration provision is severable from the remainder of the contract" and that "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance."); see also Abram Landau Real Estate v. Bevona, 123 F.3d 69, 73 (2d Cir.1997) (holding that where, as here, a contract contains a broad arbitration clause that does not expressly exclude disputes over contract termination, such disputes must be submitted to arbitration); Bhd. of Teamsters and Auto Truck Drivers Local No. 70 v. Interstate Distrib. Co., 832 F.2d 507, 510 (9th Cir.1987) ("Disputes over expiration or termination must be submitted to arbitration."); Houston Gen. Ins. Co. v. Realex Group, N.V., 776 F.2d 514, 516 (5th Cir. 1985) (finding disagreement over

---

[5] The agreement itself provides, as to its term, that it shall "be coterminous with [Regale's] Lease and shall not be sooner terminated except in accordance with the provisions of this Agreement." 1992 Agreement, Article II. "Lease" is defined as the "lease for the nightclub Premises, together with any riders, modifications, extensions and renewals thereof." Under the contract, Regale "represents and warrants that the lease, including options to renew, expires on January 31, 2017." 1992 Agreement, Article I.B.

[6] Both the Supreme Court and the Fourth Circuit have characterized similar formulations as broad arbitration clauses with an expansive reach. See, e.g., Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 398 (1967) (labeling as "broad" a clause that required arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement"); J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 321 (4th Cir.1988) (finding the scope of a clause requiring arbitration of "[a]ll disputes arising in connection with" a contract to be the same as the scope of a clause requiring arbitration of disputes that "may arise out of or in relation to" an agreement, and construing both "to encompass a broad scope of arbitrable issues" (alteration in original)).

whether valid agreement had expired to be an issue for arbitration). Indeed, to determine whether the 1992 Agreement was terminated would require the court to examine and interpret its provisions regarding termination and modification, thus deciding some of the very issues the parties agreed to arbitrate.

Having found that a valid agreement to arbitrate exists, the court also finds that the dispute at hand falls squarely within its purview. Claimants argue that Regale breached the 1992 Agreement by allowing VCG's North Carolina subsidiary to acquire its Raleigh assets, and that Regale misappropriated trade secrets and confidential proprietary information that were provided to respondents under the 1992 Agreement. Both claims arise directly under the contract, and so the court need not conduct a "significant relationship" analysis.[7] See 1992 Agreement, Article XII (governing proprietary information and trade secrets); Article XV (governing assignment by Regale).

Although the disputes at issue are within the scope of the parties' arbitration agreement, the court must consider whether, as respondents argue, claimants have defaulted their right to demand arbitration through their litigation of the tort case. While there is no doubt that claimants have vigorously litigated the related tort case, "even in cases where the party seeking arbitration has invoked the 'litigation machinery' to some degree, 'the dispositive question is whether the party objecting to arbitration has suffered actual prejudice.'" Microstrategy, 268 F.3d at 249 (quoting Fraser v. Merrill Lynch Pierce, Fenner & Smith, Inc., 817 F.2d 250, 252 (4th Cir. 1987)). Factors

---

[7] The Fourth Circuit has consistently held that a clause requiring arbitration of all disputes "arising out of or relating to" a contract embraces "every dispute between the parties having a significant relationship to the contract regardless of the label attached to the dispute." Am. Recovery Corp. v. Computerized Thermal Imaging, Inc., 96 F.3d 88, 93 (4th Cir.1996) (quoting J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 321 (4th Cir.1988)); see also Long v. Silver, 248 F.3d 309, 316-17 (4th Cir.2001) (holding that where an agreement requires arbitration of any dispute "arising out of or relating to" the agreement, the "governing standard" is whether claims have "significant relationship" thereto); Wachovia Bank, Nat. Ass'n v. Schmidt, 445 F.3d 762, 767 (4th Cir. 2006) (applying the circuit's "significant relationship" requirement despite noting its tension with the ordinary tools of contract interpretation).

8

courts consider in determining whether a party has suffered actual prejudice as a result of litigation activity by the party seeking arbitration include whether the party has born the expenses of trial, lost helpful evidence, took steps in litigation to its detriment or expended significant amounts of money on the litigation, or been put at a disadvantage because its opponent made use of discovery procedures not available in arbitration. Servomation Corp. v. Hickory Constr. Co., 316 N.C. 543, 544 (1986). The length of delay in seeking arbitration and the extent of the moving party's trial-oriented activity are also material factors in assessing a claim of actual prejudice. Fraser, 817 F.2d at 252.

As an initial matter, the court finds that any delay by claimants in asserting their right to arbitration is insufficient, in and of itself, to support a finding of default. This case is distinguishable from those in which courts typically confront the issue of delay, in that claimants have initiated no litigation against respondents, aside from this demand for arbitration, and respondents have brought no suit against claimants. Rather, respondents assert that claimants' arbitration demand should have been brought twelve years ago, when Regale allegedly suspended its payments under the 1992 Agreement, and if not then, at least soon after initiating the tort litigation against VCG. Claimants do not complain of a breach occurring twelve years ago, however, but of one that allegedly occurred in 2007 when Regale sold its Raleigh assets to VCG's subsidiary. This court will not find waiver by delay merely because claimants did not seek to compel arbitration at the first alleged breach, when that breach forms no basis of the claims now asserted. The time between the alleged breach complained of, and claimants' demand for arbitration, was approximately thirteen months. This does not seem unreasonable, and nothing in the record suggests that this delay, in and of itself, caused prejudice to respondents. See, e.g., Microstrategy, 268 F.3d at 250 (finding delay of six months,

9

which did not cause actual prejudice, insufficient by itself to support waiver); Maxum Founds., 779 F.2d at 982 ("[M]ere delay, without more, will not suffice to constitute waiver.").

Whether respondents have suffered actual prejudice as a result of claimants' litigation of the related tort case is a closer question, but the court ultimately finds that respondents have not met their heavy burden. The Fourth Circuit has held that litigation in a prior action between parties to an arbitration agreement cannot, by itself, support a finding of waiver where the claims previously litigated were factually and legally distinct from the claims later sought to be arbitrated. Microstrategy, 268 F.3d at 250; see also Doctor's Assocs., Inc. v. Distajo, 107 F.3d 126, 133 (2d Cir. 1997) (concluding that prior litigation constitutes default of the right to arbitrate only "when a party has previously litigated the same claims it now seeks to arbitrate.") And significantly, here, unlike in Microstrategy, the arbitration-seeking party's prior litigation was against a different party all together. Indeed, since no arbitration agreement exists between claimants and VCG, claimants had no choice but to utilize the judicial forum to assert their claims for tortious interference and misappropriation of trade secrets against VCG. Although the tort case involves some of the same facts that will ultimately be at issue in arbitration, the claims asserted against VCG are ultimately distinct from those claimants now seek to arbitrate.[8] This court will not find that claimants have waived their right to arbitrate their contract dispute with respondents merely because they have litigated tort claims involving some common issues of fact against a non-party to the arbitration agreement.

---

[8] A plaintiff's claims against a non-party to a contract for tortious interference will necessarily have some factual overlap with claims against a party to the contract for breach. To prevail on their claim of tortious interference against VCG in the tort case, for example, claimants must prove, among other things, the existence of a valid contract between claimants and Regale at the time of the alleged interference. The tort case involves many facts and legal questions not at issue here, however, such as VCG's knowledge of the 1992 Agreement and whether it acted without justification.

10

Respondents have born no expenses of trial, and there is no indication that any helpful evidence has been lost in the time between claimants' initiation of the tort litigation and their demand for arbitration in this case. Respondents argue, however, that they have been prejudiced by the extensive discovery conducted in the tort case, and by the costs they incurred in helping VCG respond to that discovery. The court is well aware that claimants and the tort case defendants have engaged in an extensive motions practice and conducted voluminous discovery. That discovery is now complete, and dispositive motions in the tort case are pending before this court. Although respondents are not parties to that case, respondents contend that they had to assist defendant VCG in responding to claimants' discovery demands regarding the 1992 Agreement and its alleged termination. Regale asserts that it produced many of the documents requested by claimants in the tort case, totaling over 27,000 pages, while having no reciprocal opportunity to request documents from claimants. Regale also asserts that it incurred substantial legal fees and costs, totaling over $100,000.00, as a result of its involvement as a non-party in the tort case. In essence, respondents argue that they were made de facto parties to the tort litigation, because many of the materials claimants demanded from VCG in discovery had to be provided by respondents.

Whatever respondents' involvement in assisting VCG in responding to discovery in the tort case may have been, the court finds that they have suffered no actual prejudice because of it. While it is true that in litigating the tort case, claimants availed themselves of discovery procedures that may not be available in arbitration, this, alone, is insufficient to support waiver. See Microstrategy, 268 F.3d at 251-53. And because the tort case involves claims against different parties that are legally, and to a certain extent, factually distinct from those at issue here, the expense and effort

11

respondents incurred in assisting VCG in that case cannot support a finding that claimants have defaulted the right to arbitrate the contract claims. See Id. at 251.

Furthermore, the unusually close relationship between respondents and VCG militates against a finding of actual prejudice resulting from the tort case discovery. Regale, VCG, and RRC are parties to an indemnification agreement, by which VCG and RRC have agreed to hold harmless, indemnify, and defend Regale and its affiliates and shareholders against any losses suffered, incurred, or paid in connection with the 1992 Agreement. Such losses include "any and all losses, damages, awards, assessments, judgments, fines, penalties, costs and expenses." Indemnification Agreement, Paragraph 11(a). Although respondents themselves were unable to conduct depositions and request documents in the tort case, their interests so closely overlap with those of VCG that the court cannot find respondents suffered any actual prejudice as a result of the discovery conducted in the tort case.

The court does not overlook the unusual procedural posture of this case, including the transfer of the tort case to a new venue so far along in litigation, and respondents' allegations that claimants have engaged in forum shopping. But federal policy favors arbitration, and any doubts concerning the arbitrability of this dispute must be resolved in favor of arbitration. Moses H. Cone, 460 U.S. at 24-25. Thus, the court finds that claimants have not defaulted their right to arbitration through their litigation of tort claims against different defendants, with whom they had no agreement to arbitrate.

Finally, the court considers whether Sandman, who was not a party to the 1992 Agreement but who signed it on behalf of Regale as its president, is nonetheless bound by its arbitration

12

provision and can be compelled to arbitrate the claims asserted against him individually.[9] This is a more complex issue than the parties' briefing reveals. As a general rule, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960). The Fourth Circuit has stated, however, that:

> While a contract cannot bind parties to arbitrate disputes they have not agreed to arbitrate, "[i]t does not follow . . . that under the [Federal Arbitration] Act an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision." Fisser v. Int'l Bank, 282 F.2d 231, 233 (2d Cir.1960). Rather, a party can agree to submit to arbitration by means other than personally signing a contract containing an arbitration clause.

Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 416 (4th Cir. 2000). Indeed, "[w]ell-established common law principles dictate that in an appropriate case a non-signatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties." Id. at 416-17.

The Fourth Circuit has applied a number of theories to refer to arbitration claims brought both by and against a non-signatory to the arbitration agreement.[10] This court is unaware, however,

---

[9] In deciding whether a particular party may be bound by an arbitration agreement, the court must "apply ordinary state law principles that govern the formation of contracts," First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995), and the "federal substantive law of arbitrability," Moses H. Cone, 460 U.S. at 24. See also Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 417 n.4 (4th Cir. 2000). Because the question of whether Sandman, a non-party to the 1992 Agreement, is bound by its arbitration clause presents no state law question of contract formation or validity, we look to federal substantive law of arbitrability. Id.

[10] Following the Second Circuit, the Fourth Circuit has recognized five theories arising from common law principles that can provide a basis for binding a non-signatory to an arbitration agreement: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil piercing / alter ego; and (5) estoppel. Int'l Paper, 206 F.3d at 417 (citing Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995)). The Fourth Circuit has also recognized that "[w]hen the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement." J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,863 F.2d 315, 320-21 (4th Cir. 1988). The parent-subsidiary reasoning of J.J. Ryan has also been applied in the context of a corporation and its shareholders. See Long v. Silver, 248 F.3d 309, 320 (4th Cir. 2001) (discussed infra).

of any binding precedent which would require a corporate officer to arbitrate claims asserted against him individually on the basis of an arbitration provision in a contract to which the corporation, but not the officer, was a party. Long v. Silver, 248 F.3d 309 (4th Cir. 2001), appears to be the closest case on point. In that case, the court held that the non-signatory defendant shareholders, who were corporate officers and members of the Board of Directors who controlled all of the activities of the corporation, could invoke the arbitration agreement entered into by the corporation, where the claims asserted against them were closely intertwined with the claims against the corporation. Id. at 320. The Long court relied also on the doctrine of equitable estoppel in finding that the claims against the corporate shareholders were properly referable to arbitration despite their non-signatory status.[11]

Despite its application of the intertwined claims test to a corporation and its shareholders, the principles of Long do not apply in this case. Unlike the non-signatories in Long, Sandman does not seek to invoke the arbitration agreement, but rather to avoid it. Although it is well-settled that in an appropriate case, a non-signatory to an arbitration provision can enforce, or be bound by, an arbitration provision in a contract executed by other parties, the Fourth Circuit has expressed some hesitation about forcing a non-signatory into arbitration under circumstances like those present here. In International Paper, the court recognized the Second Circuit's holding "that a 'close relationship' and 'intimate [ ]' factual connection provide no independent basis to require a nonsignatory of an arbitration agreement to arbitrate with a signatory, and therefore that a nonsignatory cannot be bound without receiving a 'direct benefit' from or pursuing a 'claim . . . integrally related to the contract

---

[11] The court in Long held that "because the facts and claims against the Corporation and its shareholders are inextricably intertwined and because [plaintiff] is claiming the benefit of his shareholder and employee status by virtue of the [agreement containing the arbitration provision] in his suit against the Corporation and the shareholders, . . . the non-signatory shareholders can compel arbitration against [plaintiff] with respect to the issues arising under and relating to the . . . Agreement." Long, 248 F.3d at 321.

14

containing the arbitration clause.'" 206 F.3d at 418 n.6 (quoting Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 778-80 (2d Cir. 1995)). The International Paper court declined to reach the issue, however, because the non-signatory against whom the arbitration provision was enforced clearly sought a direct benefit from the contract containing the arbitration provision and made a claim integrally related to it. Id. at 418 n.6. In the instant case, Sandman makes no claim relating to the 1992 Agreement and seeks no direct benefit from it. Rather, he maintains that the contract was terminated in 1996 and no longer exists. The court therefore finds that the reasoning of Long can not properly be applied in this case.

Claimants further argue that Sandman must be compelled to arbitrate based on traditional principles of agency law, but they point to no law from this circuit indicating that a corporate officer who signs a contract on behalf of a corporation is thereby bound by its arbitration provision in a subsequent dispute with him individually. Nor do claimants provide sufficient evidence or legal support for their broad contention that Sandman can be compelled to arbitrate under theories of piercing the corporate veil, a sham to perpetuate a fraud, and single business enterprise. Sandman is not a party to the 1992 Agreement and the court finds no compelling legal justification for binding him to its arbitration provision. Accordingly, Sandman cannot be compelled to arbitrate any claims asserted against him individually.

## CONCLUSION

For the reasons stated herein, claimants' motion to compel arbitration (DE #6) is GRANTED as to respondent Regale, where arbitration is proper, but DENIED as to respondent Sandman. Respondents' amended motion to stay arbitration (DE #13) is accordingly GRANTED as to respondent Sandman, against whom arbitration is permanently stayed, but DENIED as to Regale.

Case 5:08-cv-00255-FL   Document 35   Filed 03/25/09   Page 15 of 16

Respondents' request for fees pursuant to N.C. Gen. Stat. § 6-21.5 is DENIED. As no pleadings were filed in this matter and arbitrability of the dispute was the only issue presented, the clerk is now directed to CLOSE this case.

SO ORDERED, this the 24th day of March, 2009.

LOUISE W. FLANAGAN
Chief United States District Judge